1

                                                                    1

IN RE:  MATTER CONCERNING NADA RAAD


TRANSCRIPT OF TAPE RECORDED HEARING PROCEEDINGS

BEFORE PERCY HOUTS, HEARING CHAIR

Transcribed from Tape Recording



Pages 1 through 97, inclusive

Volume 1 of 1



Transcribed by:

CAROL A. McCUE, RMR

Heartland Court Reporters


PLAINTIFF'S EXHIBIT
CASE NO. F97-0068 (RRB)
EXHIBIT NO. 4

HEARTLAND COURT REPORTERS 907-452-6727

470

Exhibit 8 page 1

```
                                                                    2

 1                    A P P E A R A N C E S

 2

 3    For School District:

 4          ANITA GALLENTINE

 5

 6    For Ms. Raad:

 7          WILLIAM B. SCHENDEL, ESQ.

 8          SCHENDEL & CALLAHAN

 9          613 Cushman Street, Suite 200

10          Fairbanks, Alaska 99701

11          456-1136

12

13    Transcribed by:

14          CAROL A. McCUE, RMR

15          Heartland Court Reporters

16

17

18

19

20

21

22

23

24

25
```



3

```
 1                         I N D E X
 2   OPENING ARGUMENTS:                              Page
 3   By Ms. Gallentine:                                5
 4   By Mr. Schendel:                                  6
 5   WITNESSES FOR THE SCHOOL DISTRICT:
 6   CHARLES MOORE:
 7      Direct       Cross-Exam       Redirect
 8        9             18               32
 9   LYNDA SATHER:
10      Direct       Cross-Exam       Redirect
11       33             37               42
12   PAM HALLBERG:
13      Direct       Cross-Exam       Redirect
14       43             48               51
15   WITNESSES FOR NADA RAAD:
16   NADA RAAD:
17      Direct       Cross-Exam
18       53             77
19   MR. RAAD:    (First name unknown.)
20      Direct       Cross-Exam
21       82             88
22   CLOSING ARGUMENTS                               Page
23   By Ms. Gallentine:                               89
24   By Mr. Schendel:                                 91
25
```



```
                                                              4

   1                  P R O C E E D I N G S
   2            (The following is a transcription of the hearing
   3         proceedings regarding Mrs. Nada Raad.)
   4            MR. HOUTS:  I'm going to handle it kind of
   5   informal, if that makes sense to you.  And what I'm going
   6   to end up doing is I'll hear opening statements from each
   7   of you.  You'll each have an opportunity, then we'll
   8   begin with the District to ask for any witnesses that you
   9   have, present the statements that you want, the other
  10   side will be allowed to question.  Then you'll be allowed
  11   to requestion again if you need to for clarification
  12   purposes.
  13            And at the end I'll ask you each for your
  14   summary of what you feel you've come up with.  And then I
  15   will, in the future, render a written decision to you.  I
  16   will make a copy of the tape available to you so you can
  17   have a copy of the tape also, as well as us having one.
  18            With that, I will ask you also to present only
  19   information that is relevant to the situation that's
  20   taken place here, and not bring in other extraneous
  21   situations or circumstances that has taken place in the
  22   past or any other prior grievances that anybody may
  23   have.  What else can I tell you.
  24            With that, I guess I'll begin and ask Anita if
  25   you have some opening statement you would like to give?
```

HEARTLAND COURT REPORTERS 907-452-6727

Exhibit 8 page 4



5.

1           MS. GALLENTINE:  Yes, just a few.
2                        OPENING STATEMENT
3           MS. GALLENTINE:  Miss Nada Raad was a teacher
4  applicant with the District and has been a substitute in
5  our District since the spring of 1990.  On Friday, August
6  13th, 1993 at around 7:30 in the morning, she came in to
7  meet with Charles Moore concerning the selection process
8  for a chemistry position at Lathrop High School.
9           After meeting with Charles for over an hour, she
10 went to the superintendent's office area where she
11 demanded to meet with Mr. Rick Cross, the superintendent
12 of schools.  She appeared to be very agitated and
13 displayed aggressive tendencies.
14          When told that the superintendent could not see
15 her, she threatened to blow up the building if she could
16 not see him.  She left the superintendent's area shortly
17 thereafter and returned to Charles Morris' office area.
18          In the meantime, the police were called and when
19 Charles relayed to Miss Raad that she should leave the
20 building as the police had been called, Miss Raad's
21 response was the police should not have been called as
22 somebody was going to get hurt.
23          With the police now standing outside of Charles'
24 office area, Miss Raad then left.  Then around the end of
25 August, Ms. Raad submitted her application for substitute

```
                                                                    6
 1   teaching for the District for the '93, '94 school year.
 2   On September 3rd, 1993, I sent Miss Raad a certified
 3   letter informing her that the District would not be
 4   employing her as a permanent teacher or as a substitute
 5   due to the incident that occurred on August 13th.
 6            And that's all I have for opening comments.
 7            MR. HOUTS:   Mr. Schendel?
 8            MR. SCHENDEL:   Yes, on behalf of Ms. Raad.
 9                       OPENING STATEMENT
10            MR. SCHENDEL:   The background to what happened
11   on August 13th of this year starts in the fall, in the
12   summer of 1992, when Ms. Raad applied for a teaching
13   slot, and specifically was interested in a position in
14   Tanana.  She was denied that position.  She then
15   approached Charles Moore in his capacity as EEO officer,
16   starting on September 23rd of 1992, and had a series of
17   discussions with him about what she believed to be her
18   unfair treatment and the denial of her desire to teach at
19   Tanana.
20            Specifically, on October 2nd, 1992, Ms. Raad
21   understood that Mr. Moore entered into a commitment with
22   her that was twofold.  One, that because of what he
23   agreed had been the unfair treatment with regard to her
24   application to teach at Tanana, he would commit that she
25   would ultimately receive a full time teaching job; and
```

HEARTLAND COURT REPORTERS 907-452-6727



Exhibit 8 page 6

1    second of all, that in the meantime, he would make his
2    best efforts and would therefore commit to finding a
3    long-term substitute teaching job for her.
4         He repeated that commitment and, in fact, acted
5    on the second part of it, when in April of 1993, Ms. Raad
6    was given a long time or long term in the sense of a
7    couple months teach teaching job at Ryan, which
8    (indiscernible) completed.
9         It was on the basis of that partially filled
10   commitment that Ms. Raad continued to trust Mr. Moore and
11   had continuing contacts with him during the summer of
12   1993, in April, May and June. It was only on August 3rd
13   for the first time, August 3rd, 1993, that Mr. Moore's
14   commitment to Ms. Raad was questioned, and it was
15   specifically ten days later on August 13th that Mr. Moore
16   denied having made any commitment to Ms. Raad.
17        Ms. Raad was understandably upset by that, and
18   after talking to Mr. Moore and trying to rectify the
19   situation, did go to the superintendent's office, was
20   agitated, but specifically did not threaten to blow up
21   the building and specifically did not threaten to harm.
22        As you will hear from Ms. Raad's testimony, she
23   speaks in such a way that permits people to misunderstand
24   what she says. She will repeat exactly what she said
25   that day. She indicated that she would blow up, that her



8

```
 1   emotions were about to boil, and that she might have to
 2   take legal action, but at no time did she mention blowing
 3   up anything.  She mentioned herself blowing up, her
 4   temper blowing, and she mentioned that she might have to
 5   take legal action that would hurt people, but she did not
 6   at any point threaten harm of any sort to the facilities
 7   or any of the personnel of the school District.  Thank
 8   you.
 9            MR. HOUTS:  Okay.  Have any of you -- the
10   background information that you did give, I just need to
11   have you both aware again that I'm going to be sticking
12   to the issue of the August 13th situation that took place
13   in my decision I'm going to make here.  And I understand
14   the background and leading up to the Tanana situation,
15   but I'm not going to get involved in that aspect, I'm
16   going to be involved in what transpired actually here at
17   the building on the 13th.
18            Okay.  With that, I'll ask Anita if you
19   have -- if you will continue and at this point if you
20   have a witness to call.  Go ahead.
21            MS. GALLENTINE:  My first witness is Charles
22   Moore.
23   /
24   /
25   /
```

```
 1   He said that Jerry Hartsock would not -- I was very
 2   specific with that commitment, I said what about your
 3   commitment.  And I mentioned about position because many
 4   science teachers retired, and I mentioned this to Charles
 5   Moore that there would be a lot of positions.  According
 6   to the board meeting agenda, many people retired or left
 7   with leave without pay.
 8        So I told him what about your commitment at
 9   Lathrop with Jerry Hartsock?  He said oh, Jerry Hartsock
10   would love to have you for your multicultural background.
11   He never deny it until August 3.  He was negative but he
12   did not deny it.
13        Q.   Well, what specifically happened on August 3?
14        A.   August 3 when I went there, we were talking
15   about a commitment again, the position to be interviewed
16   for the job.  And he asked me about my background, he
17   asked me about my family background, and he asked me
18   about if I wear a veil.
19        Q.   Pardon?
20        A.   If I wear a veil.
21        Q.   A veil?
22        A.   A veil.  A black one.  And I was upset, I told
23   him if anyone had any, any concern, any problem about my
24   accent or about my background, they should not be in
25   education.
```



70

1  come and talk to me.

2  Q.  And then Pam Hallberg came out and talked to
3  you?

4  A.  Came out.  And when I told her please, I need to
5  see the superintendent.  She said is it a matter of life
6  or death?  I said yes, for me, it's a matter of life or
7  death, I need to see him.  It's personal, I need to talk
8  to him.  And then she said, he's on the phone, let me see
9  what can I do.  I told him I'm very angry, I'm very
10 frustrated, I don't want to blow up.  And I did not say,
11 I don't want to blow up, blow up the building.  I never
12 mentioned this to them.

13 Q.  What did you -- what did you say?  What words
14 did you use?

15 A.  I'm angry, I'm frustrated, I don't want to blow
16 up.

17 Q.  Blow up?  Blow out?

18 A.  Blow up.

19 Q.  Okay.  What did she say in response to that?

20 A.  She said, let me see, he's on the phone, let me
21 see if I can see him, if he can see you.  And then at
22 that moment I thought that maybe if I went back to
23 Charles Moore office and bring him back with me to
24 arrange an appointment, this might help.  And that's the
25 reason I left their office.  I went back.  The secretary