```
 1              IN THE UNITED STATES DISTRICT COURT
 2                       DISTRICT OF ALASKA
 3
 4
 5   NADA RAAD,
 6
 7                   Plaintiff,
 8         v.
 9   FAIRBANKS NORTH STAR BOROUGH
     SCHOOL DISTRICT and JOHN MONAHAN,
     in his capacity as Superintendent
10   of the FAIRBANKS NORTH STAR BOROUGH
     SCHOOL DISTRICT,
11
12                   Defendant.
13
     Case No. F97-0068 CV (HRH) Civil
14
15
16                          VIDEOTAPE
17            DEPOSITION OF RICHARD S. CROSS
18             Taken:  December 2, 1998
19             Place:  Juneau, Alaska
20
21
22
23
24
25
                        EXHIBIT 74
```

538

000736

GLACIER STENOGRAPHIC REPORTERS
P.O. Box 32340, Juneau, AK 99803
(907) 789-9028

Exhibit 13 page  1

1  A.    If time was of the essence, and the
2  position was short-term in nature, it might be
3  approved as, you know, one of the other circumstances
4  that I could see in some extremely short-term job
5  situation, where you had to have someone on the job
6  right away.
7  Q.    How short-term a job situation are we
8  talking about, days, months?
9  A.    A short -- short term would be less than
10 30 days, I would think, 30 or 45 days.  If you are
11 getting into long-term positions, you want
12 competition.
13 Q.    I received some documents in discovery
14 from the school district that shows there were some
15 teachers hired during September and October for
16 full-time positions.  Is it usual, in your
17 experience -- well, to your knowledge, is it a custom
18 and practice in the school district to use competitive
19 interviews to fill full-time teaching positions in
20 September and October of the school year?
21 A.    If they are full-time positions, the
22 procedure should be to conduct competitive interviews.
23 Q.    And based on your experience, is it the
24 custom or practice for hiring full-time non-teaching
25 employees such as a teacher's aide, does that require

But to answer your question, if there is a disciplinary action being taken, a person against whom that action is being taken should have an opportunity to be aware of the issues and have their -- be able to express their point of view with respect to those issues before the action is finalized.

Q.   During the school year 1992-93, Ms. Raad testified that she complained to Mr. Moore regarding discrimination against her based on her religion and national origin. Did Charles Moore discuss any aspect of Ms. Raad's complaint with you during 1992?

A.   Not that I recall.

Q.   Did Mr. Moore send any documents to you related to Ms. Raad's complaint?

A.   Not that I recall.

Q.   Do you know Ms. Raad's national origin?

A.   I believe today I was told that it's Lebanese.

Q.   Who told you that?

A.   Peter Partnow.

Q.   Did he say why he was telling you that?

MR. PARTNOW: Objection. Attorney-client. I instruct the witness not to answer.



1  that she was going to blow up the building. To me
2  that's the highest order. You figure out -- you deal
3  with that, and then you deal with the rest later.
4     Q.    And you didn't evacuate the building?
5     A.    At the time that I was apprised of it, I
6  was told that Ms. Raad was under -- in Mr. Moore's
7  office, and that Mr. Moore felt that the -- that
8  things were under control at that point in time, and
9  that the building was not in imminent danger, and
10 given that, I respected Mr. Moore's judgment and
11 didn't evacuate -- ask that the building be evacuated.
12    Q.    Did you speak with Mr. Moore?
13    A.    I spoke with Mr. Moore at some point in
14 time. I don't recall whether or not I spoke to him
15 directly right there when Ms. Raad was in his office.
16    Q.    So what made you think that Mr. Moore's
   ability to evaluate the threat was better than
   Mr. Hallberg's or Ms. Sather's?
       A.    Mr. Moore has a lot of experience dealing
   with volatile situations, and I respect his judgment,
   and if he said things were under control, I would
   respect his judgment. He's been under fire a lot in
   his career, and I don't -- I wouldn't have needed to
   double-check that.
       Q.    What kind of volatile situations are you

541
000730

1   aware of that Mr. Moore was involved in prior to this
2   August 13 incident?
3      A.   Mr. Moore has handled discrimination
4   complaints for a long period of time. I have seen him
5   in some -- I had seen him in some pretty tough
6   emotional situations, and felt -- had confidence that
7   he was -- was a reasonable person who didn't -- didn't
8   hesitate to act when he needed to, but didn't act
9   unnecessarily. And I had enough experience with him
10  to feel that if he said something was under control,
11  that it was under control.
12     Q.   Does that mean that you didn't trust
13  Ms. Sather and Ms. Hallberg, then, in their evaluation
14  of this situation?
15          THE REPORTER:  Just a minute.
16  Mr. Sparks. You are going to need to speak closer to
17  the microphone. Your voice is not coming clear for
18  the video record.
19          MR. SPARKS:  Okay.
20     A.   Would you repeat the question, please?
21  BY MR. SPARKS:
22     Q.   Well, from your testimony -- so are you
23  saying that you didn't trust Ms. Sather's and
24  Ms. Hallberg's evaluations of the situation?
25     A.   As I recall, I was not apprised of the

1           n't remember that.

2       Q.      Did anyone tell you that Ms. Raad wanted
3   to meet with you on August 13th?

4       A.      Before the incident?

5       Q.      Yes.  Before you were aware of the
6   incident.

7       A.      No.  I don't recall.

8       Q.      Did you have any policy of or customer
9   practice about scheduling appointments with you at
10  that time?

11      A.      My practice was that people could schedule
12  appointments with me.  They were -- they didn't always
13  get them when they wanted them, but that I didn't have
14  a "you have to clear with me first policy," which is a
15  policy some administrators use, that "You don't
16  schedule an appointment until you talk to me about
17  it."

18              I would, you know, expect that people
19  that wanted to see me would get an appointment.  Most
20  often, people that wanted to see me right away, right
21  now, wouldn't be able to do that because my days were
22  usually pretty well scheduled, but I wouldn't refuse
23  to see them.  I might refuse to see them at the
24  instant that they wanted to see me.
25      Q.      Do you recall if you ever authorized

```
 1
 2      Q.      Do you review discrimination complaints
 3  that are filed against the school district with the
 4  Alaska State Commission on Human Rights when you were
 5  the superintendent?
 6      A.      Yes, I review them, and sometimes I have
 7  been interviewed by the Commission on Human Rights.
 8      Q.      Do you recall if Ms. Raad's complaint
 9  stated that she was Lebanese that was filed in 1993?
10      A.      I don't recall that.
11      Q.      Do you recall if her complaint stated that
12  she was Muslim?
13      A.      I don't recall that.
14      Q.      Do you recall if the Human Rights
15  Commission investigator explained the basis of the
16  complaint to you when they conducted an interview of
17  you?
18      A.      I'm sure they did.
19      Q.      What was your understanding that was the
20  basis of Ms. Raad's complaint?
21      A.      Well, I mean, as I know it now, it was a
22  discrimination complaint based on religion and ethnic
23  background.  And I'm sure that when I reviewed the --
24  any complaint, the reasons for the complaint were -- I
25  was aware of the reasons for the complaint.
```



district called the police?

A.  Would you say the question again, please?

Q.  Was it your understanding that anyone had instructed Ms. Raad to leave the building prior to the police being called?

A.  The police were called after she had already been in Mr. Moore's office. So at that time, no.

Q.  Was it your understanding that anyone asked Ms. Raad -- anyone told Ms. Raad to leave the building at any time that day prior to the police arriving?

A.  I don't remember if she had been asked to leave the building or not.

Q.  At the time that you found out about this incident, did anyone tell you that Ms. Raad was Lebanese?

A.  I told you when I found out that Ms. Raad was Lebanese, and that was today.

Q.  Do you know if anyone else from the school district might have told the Fairbanks police department that Ms. Raad was Lebanese?

MR. PARTNOW: Objection. Foundation. Calls for speculation.

A.  I don't know. I don't know whether anyone

did or didn't.

Q.   Do you review discrimination complaints that are filed against the school district with the Alaska State Commission on Human Rights when you were the superintendent?

A.   Yes, I review them, and sometimes I have been interviewed by the Commission on Human Rights.

Q.   Do you recall if Ms. Raad's complaint stated that she was Lebanese that was filed in 1993?

A.   I don't recall that.

Q.   Do you recall if her complaint stated that she was Muslim?

A.   I don't recall that.

Q.   Do you recall if the Human Rights Commission investigator explained the basis of the complaint to you when they conducted an interview of you?

A.   I'm sure they did.

Q.   What was your understanding that was the basis of Ms. Raad's complaint?

A.   Well, I mean, as I know it now, it was a discrimination complaint based on religion and ethnic background. And I'm sure that when I reviewed the -- any complaint, the reasons for the complaint were -- I was aware of the reasons for the complaint.

1    published pressing criminal charges against Ms. Raad

2    if you had been the personnel director in this case?

3                MR. PARTNOW:  Objection.  Asked and

4    answered.  Lack of foundation.  Vague and ambiguous.

5         A.   My answer is I would have considered other

6    things in this police report, and might or might not

7    have pursued charges.

8                     (Loud beep)

9         Q.   Are you still there?

10        A.   We're here.

11        Q.   Okay.  Were you involved in the decision

12   to take disciplinary action against Ms. Raad based on

13   that alleged bomb threat?

14        A.   Not that I recall.  I'm sure that I was

15   kept informed of what was going on both by Mr. Moore

16   and the personnel director, Anita Gallentine, but I

17   don't remember being directly involved with it from

18   then on out.  I was obviously interviewed by the

19   Alaska Commission on Civil Rights or Human Rights

20   Commission, but I wasn't directly involved with the

21   decisions that were made.

22        Q.   Do you know that the personnel director

23   sent out a memo to the schools stating that Ms. Raad

24   wasn't eligible to be hired?

25        A.   I don't -- I haven't seen that memo.

R. CROSS - EXAM BY MR. SPARKS                     13

Hired for what?

    *MR. SPARKS:* Can you mark as the next deposition exhibit the letters, two letters, that are numbered 90152 and 90133?

    *THE REPORTER:* Off record.

    (Off record)

    (Exhibit 4 duly marked)

    *THE REPORTER:* We're back on the record. The witness has Exhibit 4.

*BY MR. SPARKS:*

    Q.    Exhibit 4 is two pages. The first page is a letter to Ms. Raad. The second page is a memo to all building administrators. Have you seen page -- the second page of Exhibit 4 prior to your deposition today, sir?

    A.    Not that I -- I don't think so.

    Q.    And was Ms. Gallentine authorized in her position to send out a memorandum such as this?

    A.    Yes, she was.

    Q.    Do you think it was fair to Ms. Raad for Ms. Gallentine to send out a memo like this to all building administrators?

    A.    Yes, I do.

    Q.    Do you know if anyone asked Ms. Raad what her side of the story was before this memo was sent

Exhibit 13 page 11

out?

A.     I believe there had been quite a bit of conversation with Ms. Raad both by Mr. Moore and Ms. Gallentine, but in terms of -- this isn't -- a decision not to make a hire is not a disciplinary action.

Q.     This letter provides that nobody can hire Ms. Raad for a position with the Fairbanks North Star Borough School District, doesn't it?

A.     Yes, it does.

Q.     And effectively that bans her from employment with the school district, doesn't it?

A.     For the time that the memorandum is in effect, yes, it would.

Q.     And how long does the memorandum say it's going to be in effect?

A.     It doesn't.

Q.     So it is permanent, isn't it, according to the memorandum?

A.     Unless it's rescinded.

Q.     And that would be the responsibility of the school district, wouldn't it, to rescind a letter such as this that was sent to building administrators?

A.     Yes, it would.

Q.     And do you know whether any document was

GLACIER STENOGRAPHIC REPORTERS

Exhibit 13 page 12